No. 14-2121

# United States Court of Appeals
# for the First Circuit

---

JOSEPH ANGIUONI

Plaintiff - Appellant

v.

TOWN OF BILLERICA; DANIEL ROSA,
individually and in his official capacity as Chief of Police

Defendants - Appellees

---

APPEAL FROM A DECISION OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

## BRIEF FOR THE DEFENDANTS - APPELLEES

---

Jeremy Silverfine
CA1 Bar #112228
Deidre Brennan Regan
CA1 Bar #100234
Brody, Hardoon, Perkins & Kesten, LLP
699 Boylston Street, 12th Floor
Boston, MA 02116
(617) 880-7100
jsilverfine@bhpklaw.com
dregan@bhpklaw.com

Dated: February 11, 2016

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................. ii

STATEMENT OF THE ISSUES ........................................................1

STATEMENT OF THE CASE ...........................................................1

    I.    Procedural History.............................................................1

    II.   Facts from the Trial ..........................................................3

SUMMARY OF THE ARGUMENT ...................................................21

ARGUMENT ..................................................................................22

    I.    To The Extent, If Any, That The Issue Is Preserved For
        Review, The Trial Court Properly Excluded Evidence Of A
        Rifle Test Allegedly Conducted After Angiuoni's Termination ........22

    II.   Where Angiuoni Failed To Request That Any Witnesses Be
        Sequestered And Otherwise Failed to Preserve Any
        Sequestration Issue For Review, He Cannot Now Claim Error
        From The Absence Of Sequestration And, In Fact, There Was
        No Error......................................................................29

    III.  Where Angiuoni Claimed That His Military Service Was A
        Motivating Factor In His Termination From The Police
        Department, Evidence That The Defendant Employed Many
        Former and Current Veterans Was Relevant And Properly
        Admitted .....................................................................32

CONCLUSION ...............................................................................38

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES:**

Alternative Sys. Concepts, Inc. v. Synopsys, Inc.,
  374 F.3d 23 (1st Cir. 2004)....................................................................25

Barrows v. Resolution Trust Corp.,
  39 F.3d 1166 (1st Cir. 1994)..................................................................23

Becker v. Department of Veteran Affairs,
  414 Fed. App. 274 (Fed. Cir. 2011) ......................................................35

Blinzler v. Marriott Int'l,
  81 F.3d 1148 (1st Cir. 1996)..................................................................32

Burroughs v. Department of Army,
  254 Fed. App'x 814 (Fed. Cir. 2007) .....................................................34

De Araujo v. Gonzales,
  457 F.3d 146 (1st Cir. 2006)..................................................................37

Faigin v, Kelly,
  184 F.3d 67 (1st Cir. 1999)....................................................................24

Geders v. United States,
  425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) ............................24

Iverson v. City of Boston,
  452 F.3d 94 (1st Cir. 2006)....................................................................30

JOM, Inc. v. Adell Plastics, Inc.,
  193 F.3d 47 (1st Cir. 1999)....................................................................32

La Esperanza De P.R., Inc. v. Perez Y Cia De Puerto Rico, Inc.,
  124 F.3d 10 (1st Cir.1997).....................................................................25

Lubanski v. Coleco Indus., Inc.,
  929 F.2d 42 (1st Cir.1991).....................................................................25

Miller v. Thayer Corp.,
        2011 WL 3624515 (D.Me. Aug. 17, 2011) ...................................................24

Rodríguez v. Municipality of San Juan,
        659 F.3d 168 (1st Cir. 2011)...................................................................31, 37

Sheehan v. Department of Navy,
        240 F.3d 1009 (Fed. Cir. 2001) ......................................................................34

Simone v. Worcester County Inst. For Sav.,
        52 F.3d 309 (1st Cir. 1995)..............................................................................30

Sony BMG Music Entertainment v. Tenenbaum,
        660 F.3d 487 (1st Cir. 2011)............................................................................24

Teller v. Shepens,
        25 Mass. App. Ct. 346, 518 N.E.2d 868 (1988) ............................................24

United States v. Abbott,
        30 F.3d 71 (7th Cir. 1994) ...............................................................................30

United States v. Bobo,
        586 F.2d 355 (5th Cir. 1978), cert. denied, 440 U.S. 976 (1979) .................31

United States v. Brandon,
        17 F.3d 409 (1st Cir. 1994)..............................................................................32

United States v. Casas,
        356 F.3d 104 (1st Cir.).....................................................................................31

United States v. Cunningham,
        359 F.3d 627 (1st Cir. 2004)............................................................................31

United States v. De Jongh,
        937 F.2d 1 (1st Cir. 1991)................................................................................31

United States v. Laboy,
        909 F.2d 581 (1st Cir.1990)..............................................................................24

United States v. LiCausi,
    167 F.3d 36 (1st Cir. 1999)...................................................... 24-25

Urban Inv. & Dev. Co. v. Turner Const. Co.,
    35 Mass. App. Ct. 100, 616 N.E.2d 829 (1993)............................................24


**STATUTES AND RULES:**

38 U.S.C. § 4301, *et seq.*............................................................1

Fed. R. App. P. 10(a) ...............................................................23

Fed. R. Civ. P. 30 ...................................................................2

Fed. R. Evid. 103 ...................................................................33
Fed. R. Evid. 103(e)...............................................................23
Fed. R. Evid. 615 .............................................................29, 31


**OTHER AUTHORITIES:**

1 Fed. Jury Prac. & Instr. § 6:4 (6th ed.) ...................................33

2 Handbook of Fed. Evid. § 103:7 (7th ed.) ...............................23

Charles A. Wright & Kenneth W. Graham,
    Federal Practice & Procedure: Evidence § 5040 (1977) ...............................23

## <u>STATEMENT OF THE ISSUES</u>

I.      Whether the Plaintiff preserved for review his claim of error in the exclusion
of evidence of a rifle test that allegedly took place after his termination from
the Police Department and whether, even if he had, there was no error in the
Court's ruling as that evidence lacked both reliability and relevance?

II.     Whether, where the Plaintiff failed to request that any witnesses be
sequestered and otherwise failed to preserve any sequestration issue for
review, he cannot now claim error from the absence of sequestration and, in
any event, there was no error?

III.    Whether, even if the issue had been properly reserved for review, the trial
court did not err in admitting evidence that Defendant employed veterans
where the Plaintiff brought a claim against the Defendants under the
Uniformed Services Employment and Reemployment Rights Act
("USERRA"), claiming that his prior military service was a motivating
factor in his termination from the Billerica Police Department?

## <u>STATEMENT OF THE CASE</u>

## I.      Procedural History

On September 20, 2011, the Plaintiff, Joseph Angiuoni (hereinafter

"Angiuoni") filed a Complaint against the Town of Billerica.  (CM/ECF #1).  On

November 29, 2011, Angiuoni filed an Amended Complaint (CM/ECF #10)

against the Town and Daniel Rosa, the Chief of Police, "under the Uniformed

Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301, *et seq.*,

after the Defendants terminated his employment as a police officer due to the

Plaintiff's military service." A. 75-83.[1] The Amended Complaint included one

count under USSERRA (Count I), one count for tortious interference (Count II),

and one count seeking preliminary and permanent injunctive relief (Count III). Id.

In November 2013, the Defendants filed a motion for summary judgment.

A. 8, 9 (CM/ECF #52-54), which Angiuoni opposed. A. 8 (CM/ECF #57-58). On

January 24, 2014, the Court (Gorton, J.) allowed the Defendants' motion with

respect to the tortious interference claim and denied it as to Angiuoni's claim for

discrimination under USERRA. A. 9 (CM/ECF # 65, 73).

Prior to trial, both parties filed various motions *in limine*. A. 10-11. One of

the motions filed by Angiuoni sought to exclude evidence of the number of

veterans in the Billerica Police Department on the ground that it lacked probative

value on his USSERA discrimination claim and that "[t]here is no allegation that

… the Defendants harbored discriminatory animus against veterans *in general*."

A. 10 (CM/ECF # 87); A. 91-92 (emphasis in original). Defendants opposed,

noting that Angiuoni's complaint alleged that persons with the Department have

"expressed a strong antagonism towards veterans" and that Angiuoni alleged there

was a "general bias against veterans" within the Department. A. 11 (CM/ECF

---

[1] Defendants refer to the Appendix filed by Angiuoni as "A." followed by the page number. Also, the Defendants have filed herewith a Motion for Leave to File a Supplemental Appendix in light of Angiuoni's failures to comply with Fed. R. Civ. P. 30. They refer to that Supplemental Appendix herein as "S.A.".

#97); A. 104-107.  The Court denied Angiuoni's motion *in limine* without prejudice.  A. 13 (CM/ECF#122).

The case proceeded to trial in September 2014 (September 15, 16, 17, 19, 23).  A. 15-16.  On September 23, 2014, the jury returned a verdict in favor of the Defendants against Angiuoni.  A. 16 (CF/ECF # 161).  The jury found that Angiuoni had not proven that his status as a disabled veteran was a substantial or motivating factor in the decisions of the Defendants to place him on administrative leave and terminate his employment.  A. 16 (CM/ECF #161); S.A. 1-2.

The Court entered judgment on September 26, 2014.  A. 16 (CM/ECF # 162).  Angiuoni filed a notice of appeal.

## II.    Facts from the Trial[2]

The Plaintiff, Joseph Angiuoni, is from Billerica and attended Billerica High School.  A. 187.  He served in the United States Army in the early 2000s.  A. 187,

---

[2] Angiuoni's factual statement is replete with conclusory assertions and argument that are inappropriate and should be disregarded.  One of the more egregious example appears at page 8 of his Brief where he argues that the court's exclusion of evidence was "offensive and prejudicial" and that it would have "disproven the Defendants' contention…"  He then cites to a document that was not admitted into evidence at trial, yet which he included in his record appendix.  Additionally, at page 6, Angiuoni says he "believes the Defendants took minor incidents and distorted them into catastrophes" to justify his "wrongful termination under USERRA."  Yet, he conveniently omits any detailed discussion of incidents and deficiencies that revealed him as a safety risk to the Department and the community and that justified his termination.

189.[3]  Angiuoni graduated from the MBTA Academy, a Massachusetts Police

approved academy in April of 2009 and began working as a probationary patrol

officer for the Billerica Police Department.  A. 66, 200.  A probationary patrol

period is a period during which a police department can see if a new officer will be

a good fit.[4]  S.A. 96-97.  Another trainee, Wendy Sullivan, was appointed at the

same time as Angiuoni.  A. 201.

The Billerica Police Department (hereinafter "the Department") has a Field

Training Program, which is a type of mentoring program for police officer trainees

to help build on their instruction at the police academy.  S.A. 85.  Lieutenant

Opland oversees the day-to-day operation of this Program for the Department.

S.A. 75, 344.  The Program uses Field Training Officers ("FTOs") to help get a

new officer acclimated to the community and to the workings of the Department.

S.A. 21, 41, 85, 346-347.  Among other things, the FTO rides along with the

trainee in the cruiser and provides on-the-job observation of and feedback on the

trainee's performance.  S.A. 68, 85-86, 346.  At the time of Angiuoni's training,

FTOs did not complete written observation reports for trainees because the police

officers' union had objected to its officers writing up any performance evaluations

---

[3] Angiuoni says he is a disabled veteran but he cites only to his complaint in
support of this assertion.

[4] A probationary officer is not a union member.  S.A. 10, 12.  An officer
becomes a union member once they become a full time officer. S.A. 12.

of another officer, and it was a subject of collective bargaining.[5]  S.A. 15-16, 23,

72, 127, 344-345.  Since the Union did not agree to officers writing performance

evaluations, the Department provided verbal feedback instead.  S.A. 127-128.

Various officers served as FTOs for Angiuoni.  S.A. 40-41, 143, 345-346.

Officer Moran served as one of several of Angiuoni's FTOs, as did Officer

Magnan, Sergeant Coffey, Sergeant Gualtieri, Lieutenant Rohnstock, Officer

Strunk and Officer Bailey and others.  S.A. 20-21, 41, 143.

Early on in his field training, Angiuoni was assigned to transport two

prisoners to court with Officer McKenna acting as his FTO.  S.A. 245-247, 450-

453.  Angiuoni backed the cruiser out of the Department's sally port, with the two

prisoners in the rear seats, and hit a wall of the fire department building across the

way.  Id.  Angiuoni was about to drive away until Officer McKenna said they had

to stop and report it, which they then did.  Id.

On the way back from court, Angiuoni saw a crew of prisoners from the

Middlesex House of Corrections where Angiuoni previously had worked, cleaning

up the roadside.  S.A. 452.  He yelled out, "losers," to the corrections officers and

inmates.  Id.  Officer McKenna immediately explained to Angiuoni why his

conduct was inappropriate.  Id.  Lieutenant Rohnstock also spoke with Angiuoni

---

[5] In his brief, Angiuoni suggests that the Department and his FTOs simply
failed to provide him with written observation reports, omitting mention that it was
a union issue.

5

about this incident, telling him it was unacceptable and that it reflected poorly on the Department.  S.A. 304.

While riding with Officer Moran as an FTO, Angiuoni made a traffic stop at which they approached a car containing two females and two males, who were between about 58 and 65 years old.  S.A. 47.  Angiuoni obtained the operator's license and registration and explained why they had stopped the car.  Id.  Back at the cruiser, Angiuoni told Moran he was going to search the car for drugs, saying he smelled something.  Id.  Moran said he had not smelled anything and that Angiuoni was not going to search the car.  Id.  Angiuoni said he had been taught at the Academy to search every car he stopped because there was always a potential for drugs.  Id.  Officer Moran said this was not true and that the age of the occupants made the prospect of drugs unlikely.  S.A. 48.

On another date, Officer Moran and Angiuoni were on patrol when they saw a white van with tinted windows in a shopping plaza parking lot.  S.A. 26-27. As they pulled up, their headlights hit the van and they could see two individuals in the back who appeared to be making out.  S.A. 44.  Angiuoni opened the door to get out but Officer Moran told him to first turn the spotlight on the car to light it up more and to let the occupants know the police were there.  S.A. 26-28, 44.  When the lights hit, the two persons separated and began adjusting their clothing and positions.  S.A. 27-28, 44.  Angiuoni started to run towards the van, and Officer

6

Moran twice told him to stop.  S.A. 44-49.  The officers had the two people exit the

car, and the female explained that the male was her boyfriend.  S.A. 49.

After the call, Officer Moran explained why they did not rush the van, but

Angiuoni was adamant that a rape could have been occurring.  S.A. 27-30, 49.

Moran explained that the circumstances did not indicate a rape situation.  Id.

Angiuoni nonetheless said they should have rushed the van, arguing that was the

way he had been taught in the Academy.[6]  S.A. 30, 49-50.

Another time with Officer Moran, Angiuoni pulled into a parking lot

because he wanted to check out a few cars parked there with the trunks open.

S.A. 52.  There were a handful of teenagers, mostly girls, around the cars.  S.A. 52-

53.  There were things like traffic cones, a "For Sale" sign, cement, and lawn

ornaments in the car trunks.  Id.  The teens explained they were having a scavenger

hunt.  Id.  They were very cooperative.  Id.  Officer Moran told the teens that they

had to return the items to their owners or it could be considered larceny.  Id.  The

teens said they would return the items.  Id.  Upon their request, Officer Moran took

a picture with one of their cell phones.  Id.  Back in the cruiser, Angiuoni

complained they should have arrested all of the teens.  S.A. 54.  Moran explained

why they did not arrest the teens, saying they lacked criminal intent and that it was

---

[6] After each call, Officer Moran discussed with Angiuoni what he did well
and what needed improvement.  S.A. 42-43.  Angiuoni did not accept negative
feedback well.  S.A. 43.  Angiuoni consistently argued with Moran, and other
FTOs, about why the way he wanted to handle a call was the proper way.  Id.

better to educate them about the implications of their conduct rather than punish them.  S.A. 54-55.  Angiuoni insisted the teens should have been arrested.  Id.

On another date, Officer Moran and Angiuoni responded to a call for a house alarm.  S.A. 31. They were dispatched to 8 Copley Place but Angiuoni called them off at 8 Cobblestone.  S.A. 55.  Moran corrected him.  S.A. 55-56.  Angiuoni was to act as the primary lead officer on this call, and Moran would be the backup.  Id.  When the officers arrived at the house, Officer Moran called in the license plate of a vehicle in the driveway while Angiuoni checked the front of the house.  S.A 31-32.  Angiuoni made contact with someone at the front door, but failed to radio this fact to Moran who had approached the house in the back.  Id.

When they returned to the cruiser, Officer Moran explained to Angiuoni that on any call with two officers, if a party responds to a door, that officer should let the other officer know.[7]  S.A. 56-57.  Angiuoni argued, saying he had not done anything wrong and that he had been told to handle the call as if he were alone.  S.A. 57.  Moran agreed, but noted that he was physically present at the house and that there was no telling what could have happened if, for example, the person had become physically aggressive toward Angiuoni.  Id.  Angiuoni said he had beaten up bigger people than the gentleman at the door, but Moran explained that the job

---

[7] Officer Moran also explained that he should have called the plate in before they left the car since they did not know who was in the house and the plate might provide useful information.  S.A. 33, 56-57.

was not about beating people up.  S.A. 57-58.  Angiuoni then went on a tirade about how Officer Sullivan gets credit for her time as a police officer, but no one gave him any credit.  S.A. 58.  Moran explained that Sullivan already had worked as a police officer in Massachusetts and thus was familiar with the law and the handling of calls.  S.A. 58.  Angiuoni became agitated, saying that he had been in Iraq and that he knew what things were like.  Id.  Officer Moran noted they were in Billerica, not in Iraq, which caused Angiuoni to become more agitated and to complain that people were out to get him.  Id.

Lieutenant Rohnstock saw Moran enter the station after this call and asked him what was wrong. S.A. 60.  Moran told him about his interaction with Angiuoni.  Id.  Moran explained how Angiuoni refused to listen, how he could not take constructive feedback, how he would not learn about the job, and how he had become fairly aggressive just then in the cruiser.  Id.

After the eight-week probationary period came to an end as of June 2009 Lieutenant Opland cleared the other probationary officer, Sullivan, to go on patrol, but he did not clear Angiuoni.  A. 348.  Throughout the eight weeks, Lieutenant Opland had been in contact with the FTOs assigned to Angiuoni and he regularly provided feedback to Chief Rosa.  S.A. 75, 91-92, 130, 347-348, 439-441.  There were concerns about Angiuoni's progress, demeanor, and professionalism from various observations during the Field Training.  See, e.g., S.A. 347, 438-444.

9

Angiuoni was not listening well, had trouble taking instructions and became argumentative with his FTOs, did not take constructive criticism well, had difficulty with simple tasks like report writing and radio communications, and basically was not getting to the appropriate level of performance. S.A. 347, 438-444.

Chief Rosa was aware that Angiuoni's training had not been going well. S.A. 75, 91-92, 130, 347-348, 439-441. Additionally, in or about May 2009, Chief Rosa learned that Angiuoni had significant issues at the firing range and that he failed to qualify on the patrol rifle. S.A. 131.[8] Angiuoni was the only officer who did qualify that day and he was the only officer in that whole training cycle who did not qualify on the rifle. S.A. 136. The Chief also learned that, while at the range, Angiuoni had insisted that he had been taught at the Academy to handle the handgun with his finger inside the trigger guard, which was not plausible as such conduct presented significant safety concerns.[9] S.A. 133-134. Chief Rosa and Lieutenant Opland decided to extend Angiuoni's Field Training to give him further training and help him be able to succeed. S.A. 153-154, 348. There is no requirement that a Department extend a training period. S.A. 151.

---

[8] The Range Operations Checklist (Exhibit 105) indicates "DNQ" or did not qualify next to Angiuoni's name. A. 22- 44; S.A. 135-136.

[9] The training officer, Grogan, had noticed Angiuoni had his finger on the trigger at a time it should have been out on the trigger guard. A. 418. When Grogan, a veteran, instructed him on this issue, Angiuoni contradicted him and said that was not how he was trained. S.A. 418-419.

At a meeting on June 1, 2009, Lieutenant Opland met with Angiuoni and reviewed a Report of Deficiencies with him in discussing the extension of his probation or training.  A. 45; S.A. 79-80, 152, 348-353.  The following areas were noted:

- Needs work on proper radio operation/communication;
- Needs work on learning the streets and the overall town;
- Needs to be aware of his surroundings while on patrol;
- Needs more time to drive in emergency and non-emergency situations;
- Did not qualify (DNQ) – firearms training (rifle);
- Involved in a m/v accident with cruiser, struck Fire Department;
- Needs improvement in police reports and m/v reports;
- Domestic Violence training.

A. 48; S.A. 154-156, 348-353.  Opland discussed these points with Angiuoni.[10] S.A. 348-353. Angiuoni was told he would be provided with remedial training to try and correct these deficiencies.  A. 66; S.A. 353-354.

There was some talk of layoffs in early June 2009, but it was just political, budgetary chatter.  S.A. 14.  Chief Rosa did not have any plans for layoffs and no layoffs ever happened.  S.A. 7, 190.  In fact, there have not been any layoffs in the Department since 1990.  S.A. 14, 190-191.  Nonetheless, at some point during this time, Angiuoni told Officer Moran that the FTOs were out to get him because of

---

[10] Notably, regarding the DNQ issue, Angiuoni did not say to Lieutenant Opland that his rifle was faulty that day.  S.A. 352.

possible layoffs.  S.A. 50.  Officer Moran said that he was the most junior of the FTOs, so if any FTOs were to be laid off, it would be him -- and the Chief would first have to layoff about one-sixth of the Department to even reach Moran.  Id.  As Moran explained, that was not going to happen.  Id.; S.A. 25.

After Angiuoni's FTO was extended, he patrolled the streets occasionally on his own in the hope this would assist him.  S.A. 93, 357.  Any probationary officer on a shift is not counted as manning on that shift and would either ride with another officer or ride backup.  S.A. 130, 357.  Angiuoni also continued riding with FTOs.  A. 66.  During this extension, the Chief checked in with Lieutenant Opland and Angiuoni's supervisors regarding his progress.  S.A. 130-131, 355.

In and after July 2009, Sergeant Gualtieri, a veteran, rode with Angiuoni at various times to observe him and assess his progress.  S.A. 161-162, 311-312.  One day, in July 2009, when Gualtieri instructed Angiuoni to patrol as he would if alone, Angiuoni drove the Sergeant around the cemetery looking at the headstones.  S.A. 161, 260, 312.  Sergeant Gualtieri explained that it was not necessary to patrol the cemetery during the day time as not much would be happening there.  S.A. 313.

On July 10, 2009, while Sergeant Gualtieri was riding along with Angiuoni, a call came in about an out of control juvenile.  S.A. 162-163, 260-263, 317.  Gualtieri said they should respond so Angiuoni took out his street book, looked up the address and began driving.  S.A. 163.  When Gualtieri asked where he was

headed, Angiuoni responded with an area of town that was not correct. S.A. 163, 317. Once corrected, Angiuoni turned around. Id. Upon arriving at the street in question, he then drove past the address, spun around, only to then pass it again. S.A. 163-164, 317. By the time they turned around a third time, Officer Brady's cruiser, acting as a backup unit, had already arrived at the address. S.A. 164, 318, 466. Once inside, Sergeant Gualtieri had the officers check the home to see if the child was anywhere inside. S.A. 164, 466. Officer Brady, another veteran, and Officer Angiuoni went upstairs to the juvenile's room. S.A. 164-165, 319, 466. While Brady checked a crawl space, Angiuoni checked under the bed. Id. After Brady backed out of the crawl space, Angiuoni reported he had checked under the bed. Id. A female relative then entered the room and remarked that the juvenile often hid under his bed, and the child in fact was under the bed – the very area Angiuoni said he had checked. Id.

Also in July, Sergeant Gualtieri observed Angiuoni set-up a radar on a road located inside a sharp curve on Allen Road. S.A. 313. It was not a good place to run radar because it was difficult to see left and right down the road. Id. Angiuoni exited the cruiser to run the hand-held radar. Id. At one point, he had to step out into the roadway in order for a vehicle to see him and stop. Id. Once the operator realized Angiuoni was trying to pull him over, he turned onto the road the cruiser was parked on but then the two cars' trunk faced each other. S.A. 313-314. After

the stop was completed, Sergeant Gualtieri explained to Angiuoni why the spot was not a good place to run radar, and identified an area on the other side of the street with a better line of sight that would be safer.  S.A. 313-315.  He also explained that an officer wants a car to stop in front of the cruiser, not behind them.  Id.

Thereafter, Sergeant Gualtieri was discussing this stop with Officer Coffey, one of Angiuoni's other FTOs.  S.A. 173-174, 315, 438-439.  Officer Coffey mentioned that Angiuoni previously had run radar with him in that same spot and he had offered the same feedback to Angiuoni then.  Id.

On yet another call in July, Sergeant Gualtieri and Angiuoni were dispatched to 35 River Road regarding a call about a suspicious female at the high school entrance.  S.A. 316-317.  As they approached, Angiuoni tried to turn into an elderly housing area – even though he had attended that very high school.  Id. Sergeant Gualtieri corrected him, and they continued to the high school entrance and responded to the call.  Id.

On September 13, 2009, Officer MacEachern and Angiuoni were dispatched to 3 Rolling Hill Road.  S.A. 256-257.  Angiuoni responded to 16 Rolling Hill Road instead.  Id.  He was corrected.  Id.  When he wrote his report, Angiuoni again put the wrong address.  Id.

14

On September 15, 2009, there was a serious incident at Kazimer Drive, which involved an attempted armed home invasion with two subjects loose in the neighborhood.  S.A. 146, 149, 257.  It was a high stress, all hands-on-deck police situation.  S.A. 146-147.  Sergeant Frost ultimately confronted and disarmed a suspect.  S.A. 146.  Although he was supposed to be on scene as backup, Angiuoni called into Sergeant Beloin on Dispatch from his cell phone some 20 minutes later to say he had gotten lost.  S.A. 146-150.  Deputy Doyle was very upset with Angiuoni as this was a serious public and officer safety issue, and Angiuoni could hear this on his call with Sergeant Beloin.  Id.  When he finally got to the general neighborhood, Angiuoni ran into Officer MacDonald.  S.A. 146-150, 324-326.  MacDonald had heard the call while on a detail and had gone to check on his family as he lived on the same street as the home invasion.  Id.  As he was returning to the detail, MacDonald ran into Angiuoni.  S.A. 150, 324-326.  Angiuoni asked MacDonald for directions to Kazimer Drive, saying he had gone to Charlesmere by mistake and that Deputy Doyle was upset with him.  S.A. 326.  MacDonald gave him directions.  S.A. 326-327.  Yet, later, Angiuoni blamed Officer MacDonald for his delay, telling Deputy Doyle that MacDonald had given him the wrong directions to Kazimer Drive, which Doyle knew to be incorrect as MacDonald lived on that street.  S.A. 150.  Chief Rosa spoke with Doyle and Sergeant Beloin about what had happened. S.A. 149.

15

In September, the Chief met with some supervisors, including Lieutenant Opland, and concerns were raised regarding Angiuoni. S.A. 138. At that time, the Chief asked that Sergeant Elmore and Lieutenant Greenhalgh take Angiuoni on their shifts to provide Angiuoni with another set of evaluators to assess his skill set. A. 66; S.A. 332-33. The concerns, however, persisted.

On October 22, 2009, Angiuoni made a motor vehicle stop in which he thought he saw a real gun between the front car seats. S.A. 178. Angiuoni asked the operator to pick the gun up with two fingers and hand it to him out the window, rather than take cover and call the stop in per protocol. S.A. 180-181. The "gun" turned out to be a toy Airsoft gun, which shoots plastic pellets. Id. Angiuoni took the pellet gun and put it in his cruiser -- without logging or reporting it. S.A. 178-183, 210-211, 338. He cited the operator for license not in possession, a seat belt violation, and a faulty exhaust. A. 73. The citation indicates there was no "non-inventory search" done of the vehicle. A. 73, 338. Angiuoni made no reference to any seizure of items in any report or citation. Id.

Sergeant Elmore, the officer-in-charge that night, was on a call with Angiuoni later that evening when Officer Casey contacted him, saying that Angiuoni had stopped a person and took an Airsoft gun off him, and that the owner was upset about it. S.A. 333-335, 338. Elmore asked Angiuoni if he made a stop that night, and Angiuoni said that he had. S.A. 179, 259, 333-335. Elmore,

16

Angiuoni's shift supervisor, said he had not heard that call, and he explained to Angiuoni that it was important to call in each stop for purposes of officer safety in case something happened during it.  S.A. 333-335.  Sergeant Elmore asked Angiuoni for the Airsoft gun, and Angiuoni said it was in his duty bag.  Id.  Elmore returned the pellet gun to the owner and apologized to him.  S.A. 181-182, 272-276, 337.  He hoped to avoid a complaint issuing against Angiuoni.  S.A. 337.

On or about October 26, 2009, there was a complaint about Angiuoni regarding a comment he made to a young female operator during a motor vehicle stop for speeding to the effect that he had been rude to her, had made derogatory comments about her relative who worked at the Middlesex Sheriff's Office, and had cursed her out.  S.A. 7-8. 13, 114-115, 205, 259.  Officer Eidens asked Angiuoni about this situation.  S.A. 8.  Eidens, a close friend of Angiuoni's, then listened to the call that lodged the complaint on his own initiative in order to determine who made the complaint and share that information with Angiuoni.  Id.  Chief Rosa later spoke with the driver's mother who confirmed the inappropriate comments.  S.A. 115.

In early November 2009, Chief Rosa met with Angiuoni and provided an overview of the issues with his performance and his unsuitability to be a police officer.  S.A. 93-94, 97-98, 194.  Lieutenant Balboni was present.  S.A. 97.  They

17

took Angiuoni's gun and badge at that time and placed him on administrative leave pending a hearing with the appointing authority, the Town Manager.  Id.

A few days later, the Chief met with Angiuoni at the request of Officer Eidens, the union president.  S.A. 100, 194.  At that time, the Chief again discussed areas of concern in Angiuoni's performance.  Id.  In response, Angiuoni complained about several officers, including Officer Moran who he alleged stated that veterans should not get special treatment.  S.A. 101-104.[11]  The fact of the matter is, however, that there are many veterans and/or active military members on the Department.  S.A. 194, 320

Thereafter, the Chief put together a case to verbally present to the Town Manager in terms of a recommendation, which included a written report dated November 23, 2009.  A. 66; S.A. 79, 138.  The report outlines the areas of concern, which included:

- Lack of self-initiative on patrol, specifically motor vehicle violation and stops and self initiated police activity;
- Radio communications (procedure and etiquette);
- Lack of knowledge of the town streets which interfered with his ability to respond to calls in a timely and efficient way;
- Failure to follow standard practices regarding officer safety at motor vehicle stops and other calls for service;
- Lack of situational awareness;

---

[11] Chief Rosa assigned Deputy Chief Doyle follow-up on some of Angiuoni's complaints, including about Officer Moran.  A. 72; S.A. 103, 189-190.

- Poor quality and accuracy of police and accident reports.[12]
- The citizen complaint in October and Angiuoni conducting his own investigation as to how that complaint came in and was handled;
- The motor vehicle stop and seizure of the Airsoft gun and failure to file a police report of the same;
- Failure to qualify at the range with the rifle despite having been trained with that weapon at the academy and the serious safety issues he presented at the handgun training and the fact that when questioned on this subject, Angiuoni accused the range officer of lying about it.

A. 66-68; S.A. 134.

Additionally, "[a]n issue of great concern is [the Plaintiff's] lack of ability to take responsibility for his own actions or take any constructive criticism during this training phase." A. 68. The Chief explained that, before he spoke with Angiuoni, he found this to be a central theme expressed by several supervisors. S.A. 66-68. He then observed this himself in his interaction with Angiuoni and he found it disturbing and surprising. A. 68; S.A. 195-196.

In the Chief's opinion, Angiuoni had not progressed through training to even minimally acceptable standards in many areas. A. 68. Angiuoni's progress and performance were completely inadequate, and his breaches in officer safety protocol were concerning. Id. The Chief considered Angiuoni as very unsafe as

---

[12] Throughout Angiuoni's training, his police report writing was deficient. A. 21, 54-56; S.A. 426-433.

an officer.[13]  S.A. 196.  It was a hard decision to terminate him, but the Department had done everything it could to get him to progress and improve and it had not worked.  Id.  As a police officer, Angiuoni presented a safety risk.  S.A. 197.  The Chief made the tough decision to recommend Angiuoni's termination as part of his responsibility to the Town and the Department.  S.A.196-197.

The Chief made his presentation to the Town Manager.  S.A. 198. Thereafter, the Town Manager, by letter dated November 30, 2009, terminated Angiuoni's employment. A. 70; S.A. 197.

Angiuoni, who was a probationary officer and non-tenured, was terminated because he had not made satisfactory progress in his training and because he was unsafe.  A. 66-68; S.A. 129.  That he was a veteran played no role in his termination.  S.A. 191.  In fact, at the time of his termination, 28 out of about 60 officers in the Department were veterans, including Sergeant Gualtieri.  S.A. 194, 320.  In addition, Chief Rosa's father was a disabled veteran.  S.A. 197.

---

[13] Officers who had driven with Angiuoni testified that he was an unsafe officer on the streets.  S.A. 440, 453.

## SUMMARY OF THE ARGUMENT

Angiuoni claims there were three errors at trial – two of which pertain to the admissibility of evidence and one regarding sequestration -- entitle him to a new trial.  He is wrong.  In the first instance, none of the three issues that Angiuoni identifies were properly preserved for review.  Even if they had been, the judge did not err with respect to any of Angiuoni's stated issues and the judgment in this case must be affirmed.

First, Angiuoni complains that the Court excluded evidence, an image of a target, that his counsel says pertains to a rifle test Angiuoni took after his termination from the Billerica Police Department.  Angiuoni, however, failed to adequately preserve this issue for review by this Court and his arguments do not indicate plain error in the court's ruling.  His arguments fail even if an abuse of discretion standard is applied inasmuch. The trial court properly exercised its broad discretion and excluded the evidence, which was not reliable or relevant.  The key rifle test is the one he took during his employment with the Department and he admitted that he failed that test.  Moreover, Angiuoni was not terminated simply for having failed the rifle test, which was not even something he had to carry as a police officer.  There was evidence of numerous incidents and events during Angiuoni's field training that demonstrated serious deficiencies in his abilities and performance that presented substantial officer, and public, safety issues.  These

21

deficiencies persisted despite the Department's extension of his field training and its efforts to help him progress as a police officer.

Angiuoni next argues that the Court failed to sequester any witnesses, but he never requested sequestration or otherwise object to the Court not sequestering witnesses.  In the absence of such a request, Angiuoni cannot now claim error from the absence of sequestration.  Moreover, Angiuoni failed to demonstrate any prejudice from the lack of sequestration.

Angiuoni likewise failed to adequately preserve his third issue – pertaining to the admission of evidence of the number of veterans on the Department -- for review by this Court where he failed to object to the admission of such testimony. In any event, the trial court did not err in admitting evidence that that Defendant employed many veterans where Angiuoni brought a claim against the Defendants under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), claiming that his prior military service was a motivating factor in his termination from the Billerica Police Department.

## **ARGUMENT**

**I.**  **To The Extent, If Any, That The Issue Is Preserved For Review, The Trial Court Properly Excluded Evidence Of A Rifle Test Allegedly Conducted After Angiuoni's Termination**

When a trial court excludes evidence, an offer of proof is necessary in order to preserve claimed evidentiary error for review.  In considering the form in which

the offer of proof is to be made, a distinction is made between testimony and documents or other tangible items.  Documents and other exhibits should be marked for identification and described on the record so that they then become part of the record on appeal even if excluded.  Charles A. Wright & Kenneth W. Graham, Federal Practice & Procedure: Evidence § 5040 (1977).  See 2 Handbook of Fed. Evid. § 103:7 (7th ed.).  Here, Angiuoni complains that the Court excluded an image of a target that Angiuoni's counsel represented as pertaining to a rifle test that Angiuoni took after his termination.  However, after the Court sustained Defendants' objection and excluded this evidence, Angiuoni did not ask to, and did not make, an offer of proof.  He likewise did not mark the document for identification.  On a practical level, such failure means that the document is not part of the record on appeal.  See Fed. R. App. P. 10(a).[14]

Angiuoni's arguments regarding the exclusion of a target from the alleged subsequent rifle test are unavailing.  They certainly do not rise to the level of demonstrating plain error affecting a substantial right, which is the required showing for claims of error that are not properly preserved.  See Fed. R. Evid. 103(e).  As this Court has stated, this standard is high and "it is rare indeed for a

---

[14] Defendants submit that Angiuoni should not have included this document in the appendix on his appeal and that it should be disregarded.  See Barrows v. Resolution Trust Corp., 39 F.3d 1166 n.2 (1st Cir. 1994) (excluding documents on grounds that "[s]ince these records were not filed as exhibits in the district court, they are not part of the record on appeal.").

panel to find plain error in a civil case." <u>Sony BMG Music Entertainment v.</u>
<u>Tenenbaum</u>, 660 F.3d 487 (1st Cir. 2011).

Angiuoni fares no better even if he had preserved the issue for review.  He
contends a *de novo* standard of review applies to a court's failure to permit rebuttal
evidence to refute or disprove evidence submitted by an opposing party, citing to
two Massachusetts cases.[15]  In this Circuit, however, the Court recognizes that
"[r]ebuttal evidence may be introduced to explain, repel, contradict or disprove an
adversary's proof," <u>United States v. Laboy</u>, 909 F.2d 581, 588 (1st Cir.1990), but it
affords trial courts a wide berth in respect to regulating such evidence.  <u>See</u> <u>Geders</u>
<u>v. United States</u>, 425 U.S. 80, 86–87, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976);
<u>United States v. LiCausi</u>, 167 F.3d 36, 52 (1st Cir. 1999) (decision as to what
constitutes proper rebuttal evidence lies within sound discretion of the trial judge
and is subject to substantial deference).  <u>See also</u> <u>Miller v. Thayer Corp.</u>, 2011 WL
3624515, at *1 (D.Me. Aug. 17, 2011) (unremarkable proposition that question
whether to allow rebuttal evidence is within discretion of the trial judge).

The standard of review on challenges to such rulings is for abuse of
discretion.  <u>See</u> <u>Faigin v. Kelly</u>, 184 F.3d 67, 85 (1st Cir. 1999); <u>United States v.</u>

---

[15] <u>Urban Inv. & Dev. Co. v. Turner Const. Co.</u>, 35 Mass. App. Ct. 100, 103,
616 N.E.2d 829, 832 (1993); <u>Teller v. Shepens</u>, 25 Mass. App. Ct. 346, 518 N.E.2d
868 (1988).

LiCausi, 167 F.3d 36, 52 (1st Cir. 1999).[16]  Under this deferential standard, the

Court will not overturn a challenged evidentiary ruling unless it plainly appears

that the court committed an error of law or a clear mistake of judgment.

Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 32 (1st Cir. 2004).

There was no error of law or clear mistake of judgment in excluding Angiuoni's

purported evidence of a subsequent rifle test.

Angiuoni claims that the Defendants "went to great lengths" to claim that

Angiuoni failed the rifle range test during his employment.  Angiuoni's counsel,

however, first raised the failed rifle test at trial, not the Defendants.  S.A. 117.  In

any event, the excluded target image did not "rebut" anything in the Defendants'

proof.  Angiuoni says that the image "would have conclusively proven that [he]

easily passed this rifle range test a few months [after his termination], and would

have supported [his] contention that the rifle utilized in the rifle range test was

subpar and/or not functioning properly."  Plaintiff's Brief, pp. 7-8.  The excluded

image could not "conclusively" prove anything.  It is simply an image of a target

---

[16] Moreover, in both Massachusetts law cases cited by Angiuoni, the courts noted that a party may present rebuttal evidence as a matter of right if necessary to refute new and unanticipated theories and/or facts at trial.  Angiuoni's failure to qualify at the rifle range was not a new fact or theory at trial, and he does not argue as such.  In any event, in this Circuit, even if the rebuttal evidence is to meet and reply to new facts brought out at trial, determinations regarding such evidence are left to the sound discretion of the trial judge.  See La Esperanza De P.R., Inc. v. Perez Y Cia De Puerto Rico, Inc., 124 F.3d 10, 20 n.6 (1st Cir.1997); Lubanski v. Coleco Indus., Inc., 929 F.2d 42, 47 (1st Cir.1991).

with holes in it.  It is undated and unsigned.  There is nothing on the document that connects it to Angiuoni or that indicates the holes on it are from a rifle test.

In an event, even if it was reliable or authenticated, the image of a target pertaining to a later rifle test is irrelevant.  The key test is the one Angiuoni took during his employment with the Department – and Angiuoni admits that he failed that one.  That Angiuoni may have passed a rifle test at some later date and some other location does not rebut and/or change the fact that he did *not* pass the test during his probationary employment with the Department.[17]

More importantly, Angiuoni was not terminated simply for having failed the rifle test and, contrary to Angiuoni's assertion, it was not a "significant" or "critical" part of their case.  In fact, a rifle is not something Angiuoni had to carry as a Billerica police officer.  S.A. 156.  Indeed, if Angiuoni had not been terminated, he would have been retrained on the rifle during the next scheduled time for training at the gun club.  Id.

It is apparent that, by focusing on his failed rifle test, Angiuoni apparently aims to deflect from his careless and unprofessional behavior at the firing range during the handgun training – wholly separate and apart from his failing the rifle component – and the numerous incidents on the street that revealed him to be unsafe as a police officer.  Incredibly, Angiuoni maintains that "the majority" of

---

[17] The jury had heard that Angiuoni had used that same rifle during his military experience.  S.A. 399.

issues or incidents regarding his performance "were simply diatribes" that these officers would have handled things in a different manner. Plaintiff's Brief, p. 18. This assertion is disgraceful. As discussed in detail above, Angiuoni's conduct during, and deficiencies revealed in, his probation and training period presented substantial and serious officer safety issues. For example, despite having grown up in the Town, Angiuoni repeatedly failed to find his way around town in an efficient and timely manner, including on the Kazimer Drive incident, and this failing placed other police officers and the town residents at risk. So, too, did Angiuoni's repeated failure to follow standard practices at motor vehicle stops and other calls for service despite instruction and re-instruction by his FTOs, as illustrated by his using Allen Drive to run radar despite having been told previously that it was not a safe area to do so. Angiuoni's areas of deficiencies failed to improve even with further instruction and the passage of time.

That Angiuoni characterizes his deficiencies as simply "diatribes" of officers who disagreed with him highlights one of the concerns with Angiuoni; namely that, rather than take instruction and learn from it, he routinely argued that his handling or assessment of a situation was the correct one and that he did not take constructive criticism well. Further, that Angiuoni essentially blames his FTOs and other officers, many of whom were veterans, for having identified his performance issues amply illustrates the Chief's concern that "[m]ost disturbing is

27

[the Plaintiff's] lack of responsibility for these issues [with his performance] and his reflecting blame for his own inadequacies on others…..." A. 68.

Angiuoni further maintains that the rifle range test is the only "third party information" reflecting a deficiency. That is not accurate. There were three officers from the Billerica Police Department who were range officers and who were overseeing the test. See, e.g., A. 460-463. These three officers, all veterans, cleaned, lubricated, and inspected the rifles so they were ready for test day. Id. Despite this undisputed fact, and his admitted failure on the rifle test, Angiuoni testified at trial that his rifle must have been faulty. A. 280.

However, various officers shot with the same, fully inspected, rifle on that test day without any problems. S.A. 118. No other officer had reported any problems with, or lodged any complaints about, any of the rifles at that time. S.A. 400, 417. Indeed, Angiuoni never claimed, while at the range, that there was any malfunction in the rifle upon hearing his test result or in later speaking to Lieutenant Opland about it, for example. S.A. 352. Angiuoni only raised the spectre that he – and only he – had a "bad" rifle that day much later, even though there is nothing to support this assertion. Angiuoni tried to call the test into question by suggesting, for example, that the serial numbers on the score sheet, shown at A. 36, indicated that each officer had a different rifle that day. This disingenuous argument fails as the serial numbers shown on that exhibit pertained

28

to each of the officers' pistols, and not the rifles they used.  S.A. 396.  In this respect, it bears mention that much of the Defendants' testimony on the rifle test was aimed at revealing the fallacy of Angiuoni's claim of a faulty rifle.  Where the "bad" rifle claim was the product of Angiuoni's imagination and was proffered by him in his case, the target image (which he says supported his speculation) does not constitute "rebuttal" evidence in the first instance and, in any event, was properly excluded.

**II.    Where Angiuoni Failed To Request That Any Witnesses Be Sequestered And Otherwise Failed to Preserve Any Sequestration Issue For Review, He Cannot Now Claim Error From The Absence Of Sequestration And, In Fact, There Was No Error**

Angiuoni argues that the trial judge "failed" to sequester witnesses.  Rule 615 of the Federal Rules of Evidence requires the trial court, *at the request of a party,* to sequester witnesses.  A crucial point -- fatal to Angiuoni's argument -- is that he never requested that any witnesses be sequestered.  Incredibly, Angiuoni represents otherwise to this Court stating that his counsel "requested that the sequestration of witnesses be invoked."  Plaintiff's Brief, p. 22, citing A. 151. The interchange on that page at A. 151, however, confirms that Angiuoni did *not* request the sequestration of witnesses:

> MR. SULMAN:  Thank you, Your Honor.  A quick question beforehand.  I noticed the next witness after this witness in the courtroom.  I wasn't sure if there was any concern, sequestration for having witnesses –

THE COURT: Well, if there hasn't been any motion about sequestration, then there's no problem.

MR. SULMAN:  The plaintiff calls Dwayne Eidens.

A. 151.

The Court specifically noted that no party had made any motion about sequestration.  Id.  Angiuoni's counsel did not disagree with the Court on this point.  Id.  Moreover, counsel did not then submit such a motion or otherwise request sequestration or lodge any objection to the Court about it not sequestering witnesses.  Rather, Angiuoni's counsel simply called his witness to the stand.  For Angiuoni to represent this interchange as his counsel having moved for sequestration is wholly disingenuous.

Having failed to move for sequestration of witnesses at trial, Angiuoni has waived any such argument.  See United States v. Abbott, 30 F.3d 71, 73 (7th Cir. 1994) (failure to move for exclusion of witnesses at trial constitutes waiver of argument on appeal that court erred in failing to exclude witnesses), citing in Simone v. Worcester County Inst. For Sav., 52 F.3d 309 (1st Cir. 1995).  See generally Iverson v. City of Boston, 452 F.3d 94, 102 (1st Cir. 2006) ("[T]heories not squarely and timely raised in the trial court cannot be pursued for the first time on appeal.).

In the absence of a request from counsel, the district court enjoys broad discretion in determining whether or not to sequester witnesses before their testimony.  See United States v. De Jongh, 937 F.2d 1, 3 (1st Cir. 1991); United States v. Casas, 356 F.3d 104, 126 (1st Cir.) order clarified sub nom. United States v. Cunningham, 359 F.3d 627 (1st Cir. 2004).  Angiuoni does not argue there was any abuse of discretion and, indeed, there was none.  See Rodríguez v. Municipality of San Juan, 659 F.3d 168, 175 (1st Cir. 2011) (claims not made or claims adverted to in a cursory fashion, unaccompanied by developed argument are deemed waived on appeal).

Moreover, Angiuoni has not and cannot demonstrate any prejudice as from the lack of sequestration.  See United States v. Bobo, 586 F.2d 355, 366 (5th Cir. 1978) (party seeking reversal on basis of violation of Fed. R. Evid. 615 must demonstrate prejudice therefrom), cert. denied, 440 U.S. 976 (1979).  Vague assertions and conclusions in this respect do not suffice.

In fact, at various points during the trial, Angiuoni's counsel himself queried witnesses as to whether they had been present during other witnesses' testimony when examining them.  See, e.g., S.A. 23-24, 74, 375, 470.  For example, in cross-examining Officer MacDonald, Angiuoni's counsel asked MacDonald if he knew Officer Eidens, a friend of the Angiuoni's, was an "outcast" in the police department to which MacDonald responded, "No, I don't."  S.A. 330.  Angiuoni's

counsel then asked if MacDonald knew that Officer Eidens had been cross-examined by the department's attorney on Monday, to which MacDonald replied, "I wasn't here Monday, sir."  S.A. 330.

### III.    Where Angiuoni Claimed That His Military Service Was A Motivating Factor In His Termination From The Police Department, Evidence That The Defendant Employed Many Former and Current Veterans Was Relevant And Properly Admitted

Angiuoni complains that the trial judge erred in allowing evidence at trial that many veterans worked on the Police Department.  This Court generally reviews the district court's rulings admitting or excluding evidence for abuse of discretion.  Blinzler v. Marriott Int'l, 81 F.3d 1148, 1158 (1st Cir. 1996).  It has consistently interpreted the scope of discretion exercised by the district court on the admissibility of evidence to be extremely broad.  See, e.g., United States v. Brandon, 17 F.3d 409, 444 (1st Cir. 1994) ("The district court has broad discretion in making relevancy determinations and we must review its decisions only for abuse of that discretion").  Regarding motions in limine, the rule is the same – the Court reviews the denial of the motion in limine only for abuse of discretion. JOM, Inc. v. Adell Plastics, Inc., 193 F.3d 47, 50 (1st Cir. 1999).

Here, trial court denied Angiuoni's motion in limine without prejudice, Add. 3, meaning Angiuoni could renew his motion or objection to such evidence later at the trial.  At trial, however, it was Angiuoni's counsel who first raised the issue of

whether an officer on the force was or was not a veteran.  During his examination of Officer Moran, who was called during Angiuoni's case-in-chief, Angiuoni's counsel asked Moran whether he was a veteran, and he replied that he was not. S.A. 19.  On cross-examination, Defendants' counsel followed up, asking Moran whether any action he took toward Angiuoni had to do with Angiuoni being a veteran, and he said no.  S.A. 62.  Moran then testified that he worked with other veterans and that, in fact, there were many veterans in the Department.  S.A. 62-63. Angiuoni did not object to this testimony.  Similarly, on trial day two, Chief Rosa testified that about half of the officers on the Police Department were veterans – and, again, there was no objection lodged by Angiuoni.  S.A. 194.

Although Fed. R. Evid. 103 says that once a court rules definitively on the record regarding the admission or exclusion of evidence, a party need not renew an objection or offer of proof to preserve a claim of error for appeal, when the court's order is *not* definitive, as here, the party must bring the issue to the court's attention subsequently to preserve it for review.  1 <u>Fed. Jury Prac. & Instr.</u> § 6:4 (6th ed.) (failure to renew the substance of a motion *in limine* risks a waiver of the issue on appeal when no definitive ruling made by court).  In the absence of so doing, a court may take notice only of a plain error affecting a substantial right. Fed. R. Evid. 103.  Here, Angiuoni has not and cannot establish such plain error.

Moreover, even if the issue can be considered as preserved, there was no abuse of discretion in the Court allowing in such evidence.

In this case, Angiuoni brought a USSERA discrimination claim against the Defendants and alleged that persons within the Department had "expressed a strong antagonism towards veterans" and that there was a "general bias against veterans" within the Department. A. 11, 104-107. Angiuoni now argues that the Defendants should not have been permitted to show that, in fact, it did not have a bias against veterans – apparently because such evidence hurt his discrimination claim. This is simply ludicrous. Evidence that the Department employed a number of veterans on its force clearly had probative value in the face of the Angiuoni's claim that he was terminated in violation of USERRA because he was a disabled veteran.

A key element of a claim under USERRA is discrimination on the basis of military service. It is not enough to show simply that the claimant is a veteran. A factor for consideration, among others, includes whether the employer has expressed hostility towards members protected by the statute. Sheehan v. Department of Navy, 240 F.3d 1009 (Fed. Cir. 2001). In Burroughs v. Department of Army, 254 Fed. App'x 814 (Fed. Cir. 2007), the Court held that, in denying a military veteran selection for the position of lead aerospace engineer the Department had not violated the anti-discrimination provision of USERRA

absence evidence to suggest the existence of anti-veteran animus on the part of the screening committee in particular, and the Department as a whole, other than the fact that he was not referred to the selection committee and ultimately was not selected.  In <u>Becker v. Department of Veteran Affairs</u>, 414 Fed. App. 274, 277 (Fed. Cir. 2011), the fact that other veterans were selected for interviews implied that something other than the plaintiff applicant's military service caused him not to be selected.  The same holds true here.  The fact that the Department hired and retained other veterans – who, as Angiuoni acknowledges and as the testimony demonstrated (<u>see</u>, <u>e.g.</u>, S.A. 20), would be entitled to the same preferences and protections under the law over non-veterans[18] – indicates that something other than Angiuoni's military service caused his termination.

Here, the evidence showed a litany of issues and concerns with Angiuoni's job performance.  Angiuoni claims that the deficiencies noted by *all* of these officers – i.e. not just Officer Moran -- during his time there had to do with his status as a disabled veteran.  <u>See</u>, <u>e.g.</u>, S.A. 239.  Certainly, in light of his own testimony, the Defendants could properly show that many of these officers themselves were veterans – including, for example, Officers Grogan and Brady

---

[18] In this respect, Angiuoni's reference to the court saying that evidence of the number of veterans had "low probative value" (Plaintiff's brief, p. 12, citing Add. 3), bears clarification.  It said the evidence was of "low probative value" only if none of the veterans in the Department received similar preferential treatment – which clearly is not the case.

who operated the firing range and who administered the rifle test that Angiuoni failed about which he complains.  S.A. 395, 459.

Angiuoni's suggestion that evidence that the Department employed veterans should have been precluded because it is "me too" testimony is way off the mark. As indicated in his own cite, at page 26 of his brief, such "me too" evidence typically involves a plaintiff trying to provide evidence that others suffered the similar discriminatory treatment in an effort to show that they suffered such treatment.  All of the cases cited by Angiuoni pertain to plaintiff's proffering or admitting such evidence in an effort to aid their discrimination claim.  Angiuoni offers no explanation or case law as to how the fact the Department employs many veterans constitutes "me too" evidence with respect to his USERRA claim.  It simply is not.

Angiuoni in his brief persists in attempting to argue that the Defendants "did not have a good relationship with veterans."  Plaintiff's brief, p. 27.  That Angiuoni presses this point highlights the fallacy of his claim that evidence regarding the Defendants' employment of veterans was not relevant to his claim.  Angiuoni makes reference to a different USERRA lawsuit brought by a different police officer against the Department, evidence of which the Court excluded on Defendants' motion, in an effort to argue prejudice.  Angiuoni, however, did not object to that ruling and does not press it on this appeal.  It is thus not before this

Court.  See Rodríguez, 659 F.3d 1175 (claims not made or claims adverted to in a cursory fashion, unaccompanied by developed argument are deemed waived on appeal); cf. De Araujo v. Gonzales, 457 F.3d 146, 152–53 (1st Cir. 2006) (petitioner's failure to challenge Board of Immigration Appeal's summary dismissal of his case for failure to file a brief waived his argument on the merits).

The same holds true with respect to Angiuoni's reference to the Court having excluded evidence of negotiations on a Collective Bargaining Agreement that occurred some four years after his termination.  A. 123-125.  Angiuoni had argued that this Agreement somehow showed that the Defendant "does not appreciate the veteran preferences…."  A. 125.  The Court could not see how the Agreement related to what happened years prior and ruled the evidence inadmissible.  A. 125-126.  Angiuoni does not argue error in this ruling on appeal, and it is deemed waived.  Rodriquez, supra.

## <u>CONCLUSION</u>

In light of the foregoing, the judgment in favor of the Defendants should be

**affirmed**.

> Respectfully submitted,
> Defendants - Appellees,
> By their attorneys,
>
> */s/ Jeremy Silverfine*
> _____
> Jeremy Silverfine
> CA1 Bar #112228
> Deidre Brennan Regan
> CA1 Bar #100234
> Brody, Hardoon, Perkins & Kesten, LLP
> 699 Boylston Street, 12th Floor
> Boston, MA 02116
> (617) 880-7100
> jsilverfine@bhpklaw.com
> dregan@bhpklaw.com

Date: February 11, 2016

## **CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

In conformity with Fed. R. App. P. 32(a)(7)(B) and (C), the undersigned state that the Brief of the Defendants - Appellees is in compliance with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i).  In this regard, according to the word count of the word processing system used to prepare the Brief, the number of words in the Brief is 9,351.

/s/ *Jeremy Silverfine*

Jeremy Silverfine

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 11, 2016, I electronically filed the foregoing Brief of the Defendants - Appellees with the United States Court of Appeals for the First Circuit by using the CM/ECF system.  I certify that counsel of record are registered as ECF filers and that they will be served by the CM/ECF system:

      John Siskopoulos
      Siskopoulous Law Firm, LLP
      198 Tremont Street, #320
      Boston, MA 02116

      Alexandra Siskopoulos
      Siskopoulos Law Firm, LLP
      33 West 19th Street, 4th Floor
      New York, NY 10011

               /s/ Jeremy Silverfine
               Jeremy Silverfine